DOCUMENT FOR PUBLIC RELEASE.  The decision issued on the date below is subject to an ASBCA Protective Order.  This version has been approved for public release.

# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Innovative Technologies, Inc. | )     ASBCA Nos. 61686, 62185 |
| | ) |
| Under Contract No. HQ0028-07-D-0003 | ) |

APPEARANCE FOR THE APPELLANT:     Andrew P. Hallowell, Esq.
      Pargament & Hallowell, PLLC
      Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Leslie K Stolasz, Esq.
      General Counsel
    Thomas Trinti, Esq.
      Trial Attorney
      Defense Media Activity
      Riverside, CA

    Christopher J. Hilborn, Esq.
      Air Force Senior Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE SMITH

These appeals concern the basis and amount of an equitable adjustment to which appellant, Innovative Technologies, Inc. (ITI), is entitled following performance of ITI's 2006-2011 service contract with respondent, the Defense Media Agency (DMA).  DMA acknowledges that ITI is entitled to an equitable adjustment but disputes the entitlement basis claimed by ITI.  We are proceeding under Rule 11, supplemented by an oral argument, to determine entitlement.  We agree that an equitable adjustment is due, but ITI's entitlement is limited to a discrete and comparatively small element of its claim.

## FINDINGS OF FACT

Solicitation and Contract Structure

Solicitation No. HQ0028-06-R-0023 (the solicitation) [1] was issued on June 19, 2006, for a firm fixed price requirements contract (R4, tab 5 at 1, 54).  The solicitation

---

[1] We refer to both the solicitation, as amended, and the almost-identical contract (R4, tabs 5 and 11 respectively) as "the contract" and cite to R4 tab 11 unless there is

was for an "engineering services contract" and each of the 40 Contract Line Item Numbers (CLINS) indicated that they were for "services" (*id.* at 2-25, 54).

The contract was awarded and administered by DMA to provide customer agencies in the Department of Defense with visual information/media system installation services and equipment based upon subsequent task descriptions, proposals and awarded task orders (TOs) that were also administered by DMA (R4, tab 3 at 2, tab 11 at 40, tab 540 at 1).  The contract was patently for the furnishing of services in the United States through the use of service employees, so it was governed by the Service Contract Act (SCA), 41 U.S.C. §§ 6701-6707.

An earlier engineering service contract between the parties (the predecessor contract) had been performed between 2001 and 2006 (R4, tabs 1-2).  And there is some indication, though no supporting evidence, that a still-earlier engineering service contract between the parties occurred between 1998 and 2001 (R4, tab 547 at 2).

The solicitation required contractors to propose fully burdened fixed hourly rates for several categories of labor (R4, tab 11 at 34).  Offerors were instructed that "[p]roposed labor rates should be 'loaded' rates, that is including base hourly wages paid, all fringes and benefits as required by the Department of Labor; G&A, Overhead(s) and Profit" (R4, tab 11 at 35).  During the source selection for the contract, DMA's acquisition personnel were instructed to compare offerors' proposed labor rates with applicable "Department of Labor rates" (R4, tab 3 at 11) which are defined by Department of Labor (DOL)-issued wage determinations (WDs).

The labor rates set by the contract constituted "the firm-fixed hourly labor rates at which all task order proposals for services must be submitted" (R4, tab 11 at 35).  After award, the parties were to negotiate a firm fixed price for each task order (TO) (R4, tab 11 at 40).

Relevant Federal Acquisition Regulation (FAR) Clauses

The contract included FAR 52.222-42, STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (MAY 1989), which is required in SCA contracts by FAR 22.1006(b).  FAR 52.222-42 provided several labor rates applicable to Federal employees that perform the functions expected to be performed by workers[2] for this contract (R4, tab 11 at 29-30).

---

a reason to distinguish one from the other in which case we refer to "the solicitation" (tab 5) and "the awarded contract" (tab 11).

[2] We use the term "workers" to broadly include employees, independent contractors, subcontractor employees, etc.

DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

FAR 52.222-41 (the SCA clause) describes the wage determination process in contracts subject to the SCA and is required in service contracts. FAR 22.1006. But contrary to FAR 22.1006, the SCA clause was not included in full text or incorporated by reference in the contract – or in any of the post-award TOs (R4, tab 11, tab 540 at 1). DMA later described the omissions as "error" and "administrative oversight," but could not provide details on these mistakes (R4, tab 550 at 10; app. mot. at ex. A, response to appellant's Interrogatory Nos. 3, 11).

Our comparison of the predecessor contract with the contract here suggests that DMA's administrative oversight was to omit from the current contract FAR 52.212-5 CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS--COMMERCIAL ITEMS (AUG 2000), which lists 37 FAR clauses, including the SCA clause, that can be check-marked to incorporate them by reference (R4, tab 1 at 32-35). DMA included FAR 52.212-5 in the predecessor contract and checked 12 of the optional clauses, including the SCA clause (*id.*). The omission of FAR 52.212.5 may have been due to confusion between it and a similarly titled Department of Defense Supplement to the Federal Acquisition Regulation (DFARS) clause, 252.212-7001, which lists various DFARS clauses to be checked to incorporate them by reference (R4, tab 1 at 38-39, tab 11 at 35). Slightly different versions of DFARS 252.212-7001 were included in both the predecessor contract and this contract (R4, tab 1 at 38-39, tab 11 at 35).

Regardless of how it occurred, DMA's omission of FAR 52.212-5, and its 12 checked clauses incorporated by reference, appears to be a considerable oversight. But there is no evidence that the omission was intentional or focused upon the SCA clause or any particular aspect of the SCA at all.[3] Instead, it appears to have been a *bona fide* administrative oversight in the assembly of the contract.

Attachments to the Contract and Wage Determination No. 35

The "EXHIBITS AND ATTACHMENTS" section of the contract indicated that "[t]he following documents, exhibits or other attachments, if any, form a part of this document" (R4, tab 11 at 29). It listed an Exhibit A, which was the performance work statement, and Attachments 1, 2, and 3. *Id.*

---

[3] FAR 22.1006 also requires an agency to expressly indicate if a contract is exempt from the SCA via the inclusion of other FAR clauses that notify the parties of the exemption. *See* FAR 22.1006(a)(2). No exemption language was in the contract here.

Attachment 1 was described as "Contractor Labor Categories (Contractor Fill-In)" (R4, tab 11 at 29), and the document itself was a one-page "Contractor Labor Categories Summary" that listed eight job description labels (Project Manager, Engineer, Equipment Specialist, Technical Writer, Cable Installer, Draftsman, Clerical, and Electronic Helper) with blank areas for offerors to propose "Fully Burdened/Escalated Rates" that would apply for the base year and each of the four option years for each of the eight job descriptions (R4, tab 11 at 49).

Attachment 2 was a series of lists of equipment that might be ordered in the TOs that are not germane to this dispute (R4, tab 11 at 50-58).

Attachment 3 was described as "Wage Determination No. 94-2103 REV (35)" effective on May 23, 2006 (WD35) (R4, tab 11 at 29).  The wage determination document indicated that WD35 was the 35th revision of WD No. 94-2103 (R4, tab11 at 59).  WD35 was geographically applicable to Washington, DC, and several nearby counties in Maryland and Virginia, generally considered to be the Washington, DC, metropolitan area.  *Id.*

Amendment 2 to the solicitation, issued on July 19, 2006, and acknowledged by ITI in its price proposal, responded to offeror questions and provided clarifications, one of which was "[O]n page 56 of 62 of solicitation 3.1.2 Site Survey/ Report, due to administrative error delete . . .T-ASA Trip Report Format, Attachment (3).  Attachment (3) is the Wage Determination" (R4, tab 7 at 2, tab 9 at 14).

DOL publishes WDs and WD revisions for all locations within the United States and for some foreign locations, which are required to be included in virtually all service contracts.  FAR 22.1007.  WDs define minimum wage and fringe benefits to be paid to numerous categories of contractor employees performing a wide range of services for the federal government (R4, tab 11 at 59-68); *see also* 41 U.S.C. § 6703(1)-(2).

WDs also describe a multi-part "conformance" process where contractor job descriptions that are not already listed in a WD can be assessed by DOL and their minimum wages and benefits established (R4, tab 11 at 67-68).  *See also* FAR 22.1019; 52.222-41(c)(2)(ii).  It is the contractor's responsibility to initiate the conformance process where applicable.  *See* FAR 22.1019(a) (requiring that "[t]he contractor shall initiate the conforming procedure before unlisted classes of employees perform contract work"); *see also Collins Int'l Serv. Co. v. United States*, 744 F.2d 812, 814-15 (Fed. Cir. 1984) (describing contract provision requiring the contractor to classify service employees not included in DOL wage determination distributed to bidders); *Northern NEF, Inc*., ASBCA No. 44996, 94-3 BCA ¶ 27,094 at 135,004 (noting that "the burden of inaccurate or missing wage rate classifications is placed on

4

the contractor") . The process for preparing a conformance request was described in the contract (R4, tab 11 at 67-68).

ITI was located in Chantilly, Fairfax County, Virginia, where WD35 applied (R4, tab 11 at 1, 59). The contract did not identify any specific locations outside the scope of WD35 where TOs could or would be performed, but the predecessor contract had TOs performed in several locations worldwide, in addition to Chantilly VA (R4, tab 10 at 39-51).

The Parties' Pre-Award Actions

    a. The Predecessor Contract

In contrast to the contract here, the predecessor contract included the mandatory FAR SCA clause, but did not contain any WDs (R4, tab 1 at 34-35). The solicitation for the predecessor contract contained bidder questions and answers that described how WDs would be issued, and TO prices adjusted accordingly (R4, tab 548 at 54). It is unclear from the record whether and how WDs were actually used by either party during the performance of the predecessor contract.

    b. DMA's Acquisition Plan

The SCA applies to service contracts, whether or not the contracting parties expressly acknowledge that fact. *Alutiiq Com. Enter., LLC*, ASBCA No. 61503, 20-1 BCA ¶ 37,506 at 182,199 n.7. And, as discussed above, there is no allegation (or evidence that we have found) that DMA intended to exempt or preclude the contract from the SCA while keeping all other aspects essentially the same as the predecessor contract. Instead, the Source Selection Evaluation Guide for this contract indicated that DMA would "determine whether the offerors used the applicable Department of Labor (DoL) direct labor rates (Service Contract Act) for the requested labor requirements (skill mix)" and that DMA would "review whether the offerors used the applicable DoL health and welfare rates to the specific labor requirements" (R4, tab 4 at 15). The Source Selection Plan stated that "[t]he offeror's proposed prices for labor categories will be reviewed and compared to the government equivalent rates and Department of Labor rates (where applicable)" (R4, tab 3 at 11). That said, DMA indicated in discovery that there is no documentation or evidence that these source selection comparisons actually took place (app. mot. at ex. A, response to appellant's Interrogatory No. 8).

DMA indicated in a 2017 letter (well after the conclusion of the contract) that it "awarded the subject contract . . . with the understanding that the Service Contract Act

of 1965 applied . . . just as it had expressly applied to the nearly identical [predecessor contract] awarded to ITI in 2001" (R4, tab 540 at 1).

DMA's factual assertion that "[w]hile planning for the . . . contract, the Agency understood that the SCA would apply" (gov't mot. at 6), is unsupported in the pre-award record, except for the terms of the solicitation itself.  But we also cannot agree with ITI's contention that the parties did *not* consider the SCA applicable (app. opp'n, Addendum Nos. 5, 12 at 2-3).

ITI's Proposal

Repeating the contract requirement for labor rates almost verbatim, ITI's price proposal of July 20, 2006, included "PROPOSED LABOR RATES FOR PERFORMANCE OF SERVICES" that represented in sections B-1 and B-2 that "[t]he labor rates proposed . . . are 'loaded labor rates' . . . [that] include base hourly wages paid, all fringes and benefits required by the Department of Labor, Overhead(s), G&A, and Profit . . . ." (R4, tab 9 at 22).  ITI also said "[i]t is anticipated that the loaded labor rates submitted will become part of any contract resulting from this proposal and will constitute the firm-fixed hourly labor rates at which all task orders for services will be submitted by ITI" (*id.*).

ITI's technical proposal indicated in the "Compensation" section that "[a]nnually, the firm's management reviews such data as the Bureau of Labor Statistics 'National Compensation Survey'; industry salary surveys, *USDOL Service Contract Act Wage Determinations*; and related data (such as the various Job sites on the Internet) to ensure our compensation structure remains fair and competitive with the market" (R4, tab 10 at 38 (emphasis added)).

ITI's proposal referred to ITI's "employees" throughout, including a check box that ITI's average number of employees was between 101-250 and a specific description of ITI as "a $20 million dollar company with 170 employees" (R4, tab 9 at 17, tab 10 at 52).  Our review of ITI's proposal did not find any express or implicit indication that ITI would perform the contract with independent contractors or subcontractors instead of ITI's own employees (R4, tabs 9-10).

Despite the instruction to do so, ITI's proposal did not include a filled-in version of Attachment 1 (R4, tab 11 at 49).  Nor did ITI adopt the labor categories or labor rates contained in WD35.  Instead, ITI's proposal listed 51 labor categories that for the most part were not listed in the solicitation, Attachment 1, or in WD35 (R4, tab 9 at 23, 29-55).  ITI proposed a labor rate for each of its 51 labor categories that increased incrementally from the base year through each of four option years.  *Id.* at 30-33.

Based upon our review of the record, neither ITI nor DMA sought to obtain conformance WDs from DOL for ITI's 51 labor categories (*see also* R4, tab 550 at 36).  Nor did ITI explain why it used its own labor categories or why ITI chose not to obtain conformances for them.  It is unclear how DMA compared ITI's price proposal to other offerors' proposals without an apples-to-apples comparison of labor categories – as the solicitation contemplated with Attachment 1.  Without identical labor categories between ITI's proposal and WD35, or a conformance before or after award, it is unclear whether all, or any, of the labor rates proposed by ITI, accepted by DMA, and memorialized in the contract were in compliance with WD35 (R4, tab 9 at 23, 30, tab 11 at 59-65).

It is also unclear whether or how ITI used WD35 or any other wage determination internally when proposing its labor rates for the contract (R4, tab 9 at 22, tab 11 at 35).  Although ITI proposes facts regarding how ITI interpreted the presence of WD35 and the lack of the SCA clause in the solicitation, which we address below, the record does not contain any contemporaneous documents showing whether ITI internally considered it unusual, or even noticed, that a WD was included in the solicitation but the SCA clause was not.

Although ITI submitted two pre-bid questions about other matters, ITI did not submit any pre-bid questions regarding the applicability of the SCA, the omission of the SCA clause, or the applicability of WD35 (R4, tabs 7, 552).

ITI does not contend, or offer any evidence, that it would have proposed different contract labor rates, or acted differently in any other way, if the SCA clause had been incorporated into the solicitation.  And we have found no evidence in the record regarding ITI's contract labor rates other than the technical proposal, quoted above, where ITI said that it compared its compensation to "USDOL Service Contract Act Wage Determinations" (R4, tab 10 at 38).

Based upon the contents of the solicitation and ITI's proposal, we find as a fact that ITI's proposal indicated that the contract would be performed by ITI's own employees who would be paid consistent with ITI's proposal which was, in turn, compliant with DOL and SCA requirements (R4, tabs 9-10).

Award and Performance of the Contract

The contract was awarded to ITI on November 7, 2006, as Contract No. HQ0028-07-D-0003 (R4, tab 11).  Performance occurred between 2006 and 2013, with ITI completing 155 TOs in 100 locations in the U.S. and abroad, both inside and outside of the geographic scope of WD35 (R4, tabs 11-527, 529-537).

TOs ranged widely in dollar amount from a few thousand dollars to several million dollars (R4, tab 2).

WD No. 94-2103 was superseded after 2006 by WD No. 05-2103 (R4, tab 530). Thus, WD35 only applied during the base contract year and none of the four option years. As with the solicitation and award periods, neither party appears to have mentioned WD35 or any WD to the other during the entire course of performance. After this dispute arose, DMA acknowledged that "there were numerous other Wage Determinations which were omitted that should have been incorporated into the contract to reflect the various locations throughout the U.S. where work was performed during the five and one half year contract term" (R4, tab 540 at 1).

The record does not reflect whether, after contract award, ITI internally considered any WDs when proposing for, or performing, the TOs. Consistent with the contract requirement, and ITI's contract proposal, ITI's TO proposals used the contract labor rates for the labor categories listed in ITI's proposal (*compare, e.g.*, R4, tab 9 at 23 *with* tab 66 at 9, tab 428 at 22). ITI's TO proposals said "ITI proposes to furnish material and labor in accordance with above quotation" (*see, e.g.,* R4, tab 66 at 9, tab 428 at 22).

There is no indication in the record that DMA audited, questioned, or otherwise concerned itself whether ITI actually paid its workers consistent with the contract labor rates that were incorporated into ITI's TO proposals. As became evident later, ITI did not actually pay its workers consistent with the contract labor rates, at least in some instances (R4, tabs 535, 545, 550). Similarly, either by conscious choice or based on a mistaken conclusion that it was not required by contract or the SCA, during the first year of the contract, ITI paid at least some of its workers less than the rates required by WD35.[4] *Id.* ITI also paid some of its workers less than the rates required by WDs that applied beyond the geographic scope and timeframe of WD35. *Id.*

In sum, despite the applicability of the SCA and inclusion of WD35 in the contract, both parties failed to mention or take action upon the numerous WDs that applied before and during ITI's contract performance.

---

[4] This is contrary to the SCA clause which requires that "[e]ach service employee . . . shall be paid not less than the minimum monetary wages . . . as specified in any wage determination attached to this contract." FAR 52.222-41(c)(1).

DOL's Investigation, Assessment, Enforcement, and Settlement with ITI

In May 2012, as ITI was completing its final task orders, "informants" notified DOL of several different types of alleged labor violations (R4, tab 535 at 2 (para. 8), tab 550 at 2-3).  DOL promptly began an enforcement investigation.  *Id.*

Early in DOL's investigation, DOL told DMA, apparently by telephone because there is no contemporaneous written record, that, per FAR 22.1015, DMA should have incorporated the SCA clause and all applicable WDs into the contract (R4, tab 550 at 10) (noting agency's acknowledgement of same).  DOL indicated that the omissions should be corrected by contract amendment, which would provide DOL with enforcement jurisdiction.  *Id.*

DMA and ITI formally modified the contract in 2012-2013 to add the SCA clause, FAR 52.222-4, CONTRACT WORK HOURS AND SAFETY STANDARDS ACT – OVERTIME COMPENSATION (JUL 2005) (hereinafter CWHSSA clause),[5] and the WDs that applied to all of the timeframes and locations of ITI's TO performance for the duration of the contract, including WD35 (R4, tab 528-34, tab 550 at 30; app. supp. R4, tab 10).  These modifications occurred as follows.

Modification No. 10 added the SCA and CWHSSA clauses and did not include any equitable adjustment language (R4, tab 528).

Modifications Nos. 11-16 were divided by each of the contract years and added a total of approximately 50 WDs applicable in both time and geographic location to the work ITI had performed (R4, tabs 529-534).  All six modifications included this equitable adjustment language:

> The Government shall equitably adjust the contract price to reflect any changed cost of performance resulting from incorporating the attached wage determination rates or any revisions thereto.  The execution of this modification by Innovative Technologies, Inc. shall not constitute an admission or waiver of rights of the company, and all rights are reserved.

---

[5] The CWHSSA applies to several types of Federal and "federally assisted" contracts, not just service contracts.  40 U.S.C. §3141(b).  The CWHSSA clause is not required to be included in service contracts.  Thus, the absence of the CWHSSA clause in the contract (prior to modification 10) was not one of DMA's administrative oversights.

DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

*Id.*

ITI's performance concluded on or about January 12, 2013 (R4, tab 536 at 2). Modifications Nos. 11-15 were signed subsequent to completion, on June 25-26, 2013, and Modification No. 16 was signed on November 6, 2013 (R4, tabs 529-534).

DOL's investigation ended in October 2013 with a report that charged ITI with several types of labor violations (R4, tab 550 at 54 (noting date of final conference)). DOL found that ITI's "failure to pay [the] prevailing wage mostly resulted from misclassification of employees" as independent contractors and exempt salaried employees (R4, tab 550 at 8-10). DOL also found that ITI had misclassified workers as temporary employees or in lower labor categories than their work justified (R4, tab 550 at 10-25, 27) and that "[t]he misclassification of employees resulted in wage payments inconsistent with the requirements under the applicable wage determinations" (R4, tab 550 at 24). We refer to this group of labor violations as "misclassification."

DOL also determined that, in violation of the CWHSSA,[6] ITI had failed to pay overtime (time and a half wages) where "some employees were just paid straight time for all hours worked over 40 in a workweek" (R4, tab 550 at 46). We refer to this as "nonpayment of overtime."

DOL also found that ITI failed to pay appropriate fringe benefits, which we refer to as "insufficient fringes" (R4, tab 550 at 26-29).

In some instances, DOL found that, even in the absence of other labor violations, the wages actually paid by ITI (which were often below the rates it had promised to pay its workers in its proposal and in the contract itself) were lower than the applicable WD rates (R4, tabs 550 at 10). We refer to this as "WD underpayment."

Finally, although no back pay was assessed as a result (in contrast to the other violations noted above), DOL determined that ITI violated the SCA by failing to keep sufficient employee and payroll records and by failing to post required employee notification posters (R4, tab 550 at 29-30).

In sum, we count at least four distinct types of labor violations committed by ITI that resulted in monetary assessments by DOL and back pay to ITI's workers. It is important to note that, when comparing job classifications between ITI's proposal and equivalent WDs (*i.e.* the conformance that ITI should have done prior to award), DOL

---

[6] DOL's investigation report is divided into separate SCA (R4, tab 550 at 1-37) and CWHSSA sections (*id.* at 37-55).

did not find that ITI's contract labor rates had been set below WD35.  Similarly, DOL did not analyze or expressly find that ITI's contract labor rates were below the newer WDs that became applicable during contract performance.[7]

Based upon DOL's review of all 155 TOs, DOL made a $1,767,807.55 assessment against ITI to retroactively pay 175 of ITI's workers the difference between what they were actually paid and what they should have been paid if properly classified, paid overtime, provided fringes, and paid according to the applicable WDs (*see* R4, tab 535 at 2-3, 5 (DOL back pay claim), 5; R4, tab 550 at 24-25 (DOL back wage calculations).[8]

ITI contested DOL's $1,767,807.55 assessment, arguing that ITI ". . . did not violate the SCA provisions because SCA clauses and wage determinations were not incorporated into the contract until the very end of the contract" (R4, tab 550 at 31). DOL disagreed and concluded that "[t]here is no reasonable excuse for the violations and [ITI's] unwillingness to make employees whole" (*id.* at 36).  The matter became a DOL administrative enforcement proceeding in May 2015 which was concluded in May 2016 with a negotiated settlement of $1,530,000 – $237,807.55 lower than DOL's $1,767,807.55 assessment (*id.* at 3-4, 8).  DMA did not directly contribute to DOL's investigation, enforcement action, or the settlement agreement between DOL and ITI (R4, tab 535 at 1, 5-6).

The settlement agreement indicated that "[t]he [DOL] Administrator has no position regarding the availability of an equitable adjustment, which is a decision made by the DMA, but agrees that the amounts released from the above-referenced escrow account . . . stem[] from the retroactive application of the Service Contract Act of 1965 *and* the associated wage determinations" (R4, tab 535 at 5 (italics added)).

Despite the additive word "and" in the quotation above, there is no evidence of a separately calculated assessment for "application of the Service Contract Act of 1965" (R4, tab 539).  Instead, DOL's assessment corrected ITI's misclassification, nonpayment of overtime, insufficient fringes, and WD underpayments then calculated

---

[7] A subsequent DCAA audit indicated that ITI's contract labor rates were often substantially higher than the equivalent WD rates (*see* R4, tab 544 at 12 (labor analysis results), tab 545 at 19-45 (labor analysis by task order and labor category), and that overall, ITI's total labor costs would have been considerably *lower* if it had paid its workers at the WD rates versus the contract labor rates during the entire contract period.  *Id.*

[8] This finding is supported by the recitation of facts in the settlement agreement discussed below.  Oddly, we have not located a written DOL assessment of $1,767,807.55 in the record.

back pay for each worker using the WDs applicable to the dates and locations where their work was performed (R4, tab 550).  In sum, DOL's assessment against ITI was the difference between what ITI's workers were actually paid and what they should have been paid but for ITI's multiple labor violations.  *Id.*

The settlement agreement did not describe the precise basis, if any, upon which DOL's original assessment of $1,767,807.55 was reduced by $237,807.55 to $1,530,000 (R4, tab 535).

Once the settlement took effect, DOL provided back pay to individual workers that are shown on DOL's "agreed to pay" (ATP) reports (R4, tab 539 at 3-14).  The back pay for each worker ranged from approximately $20 to over $51,000.[9]  *Id.*

DOL issued a press release on June 23, 2016, that described the conclusion of its action against ITI (R4, tab 537).  According to DOL:

> The [DOL enforcement] lawsuit was filed based on the division's investigation, which found ITI:
>
> • Incorrectly categorized and paid approximately 127 engineering technicians as lower-paid audio-visual and installation technicians.
>
> • Incorrectly categorized and paid approximately 10 warehouse specialists and supply technicians as lower-paid warehouse assistants.
>
> • Failed to provide legally required fringe benefits to approximately 130 employees.
>
> • Failed to properly provide vacation pay and holiday pay to several employees, including those employed by subcontractors.

---

[9] Presumably, because DOL made payments totaling $1,530,000 to ITI's workers, documents exist that break out the specific labor violations and WDs used to calculate each worker's back pay.  We have not located documents meeting that description in the record, which may be important for determining quantum, but they are not necessary for this entitlement decision.

DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

> The division also concluded that the contractor failed to pay employees overtime at time and one-half the required prevailing wage rates when they worked over 40 hours in a workweek, in violation of the Contract Work Hours and Safety Standards Act.

(*Id.* at 1)

Notably, DOL's description of ITI's labor violations did not include WD underpayment, which, based upon a supplemental DCAA audit conducted in early 2019, appears to be only a small portion of DOL's original assessment and the parties' subsequent settlement amount (R4, tab 545 at 10-11, 45).

ITI's Equitable Adjustment Claim

In January 2017 ITI submitted an REA that sought payment from DMA for the entire DOL settlement amount of $1,530,000, plus "the applicable burdens" of $853,450.78, for a total of $ $2,383,450.78 (R4, tab 536). ITI contended that "[t]he need for this REA arose when it was retroactively determined by the U.S. Department of Labor (DOL) that this contract was subject to the Service Contract Act. DOL ruled all service employees working on this contract should have been compensated per the applicable wage determinations"[10] (R4, tab 536 at 2). ITI argued that it was entitled to an equitable adjustment under FAR 22.1015,[11] but also based on the equitable

---

[10] DOL's narrative report (R4, tab 550) and DOL's press release (R4, tab 537) do not support ITI's characterization of DOL's investigation and conclusions. Throughout its claim and these appeals ITI largely ignores the several labor violations found by DOL. Instead, ITI inaccurately portrays DOL's assessment as a simple finding that ITI did not pay its workers at the rates in the WDs that had been omitted by DMA (*see, e.g.*, R4, tab 536 at 2).

[11] FAR 22.1015, DISCOVERY OF ERRORS BY THE DEPARTMENT OF LABOR, provides:

> If the Department of Labor discovers and determines, whether before or after a contract award, that a contracting officer made an erroneous determination that the Service Contract Labor Standards statute did not apply to a particular acquisition or failed to include an appropriate wage determination in a covered contract, the contracting officer, within 30 days of notification by the Department of Labor, shall include in the contract the clause at 52.222-41

13

adjustment language in modifications 11-16 (R4, tab 536). DMA rejected ITI's REA (R4, tab 538), whereupon ITI submitted a certified claim for a revised amount of $2,291,404.08 (R4, tab 543). In addition to reiterating its entitlement arguments based upon FAR 22.1015 and modifications 11-16, ITI added an argument for entitlement under the changes clause, FAR 52.243-1 (*id.* at 6).

When evaluating ITI's certified claim, DMA obtained two DCAA audits that analyzed ITI's contract labor rates, certified claim, and actual performance costs (R4, tabs 544-45).

DMA did not issue a decision on ITI's certified claim within 60 days and ITI filed the first of the two appeals before us ( ASBCA No. 61686), in the same amount as the certified claim, on the basis of a deemed denial. Subsequent to the appeal, DMA issued a Contracting Officer's Final Decision (COFD) that found that ITI was entitled to an equitable adjustment in the amount of $568,754 (R4, tab 547). ITI submitted a second appeal (ASBCA No. 62185), challenging this COFD and seeking "in excess of $2,291,404.08" which includes immediate payment of the $568,754 offered in the COFD.

In response to ITI's appeals to the Board, DMA disputes the legal and factual bases of ITI's claim, disavows the COFD's calculation of quantum, and seeks *de novo* resolution of the entitlement parameters for ITI's equitable adjustment.

## DECISION

**Standard of Review**

By agreement of the parties following their summary judgment briefing and oral argument, entitlement is being decided pursuant to Board Rule 11 "Submission Without a Hearing." Unlike a motion for summary judgment, which must be adjudicated on the basis of undisputed facts, Rule 11 authorizes the Board to "make findings of fact on disputed facts" based upon the written record. *U.S. Coating*

---

and any applicable wage determination issued by the Administrator. If the contract is subject to 41 U.S.C. § 6707(f), the Administrator may require retroactive application of that wage determination. The contracting officer shall equitably adjust the contract price to reflect any changed cost of performance resulting from incorporating a wage determination or revision.

*See also* 29 C.F.R. § 4.5(c) (parallel DOL regulation).

*Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031.  While the parties identified relatively few fact disputes in their briefs and at oral argument, we have conducted a thorough review of the record upon which our findings of fact, above, are based.

## I.     The SCA Applied To ITI's Contract and ITI Was Required to Comply With WD35 When Setting its Contract Labor Rates

The SCA applies where a contract is for "the furnishing of services in the United States through the use of service employees."  41 U.S.C. § 6702(a)(3).  The SCA directs DOL to issue WDs that set minimum pay[12] for enumerated classifications of workers that vary by geographic region.  *See generally* 41 U.S.C. § 6701 *et. seq.*  Among other things, WDs prevent contractors from underbidding competitors and winning contracts at the expense of their own workers.  *See Lear Siegler Servs., Inc. v. Rumsfeld*, 457 F.3d 1262, 1266 (Fed. Cir. 2006); *see also Gov't Contracting Res., Inc.*, ASBCA No. 59162, 15-1 BCA ¶ 35,916 at 175,575 (citing *Lear Siegler* for the proposition that successor contractors are prohibited from paying less than a predecessor paid under its collective bargaining agreement).

Here, ITI's "engineering services contract" plainly fell within the purview of the SCA, whether or not ITI correctly interpreted the express title of the contract, all of the CLIN descriptions, the several invocations of the SCA within the contract, the inclusion of a Wage Determination directly applicable to ITI's primary place of business, the fact that the nearly-identical predecessor contract was expressly an SCA contract, and the fundamental nature of the contract to provide services to the government.  DMA's omission of the SCA clause and other administrative lapses, however negligent, did not alter the fundamental nature of the contract, nor the applicability of the SCA.  Thus, as a matter of law, the SCA's requirements and the wage determination process applied to both parties from the contract's inception.[13] *Alutiiq Com. Enter., LLC*, 20-1 BCA ¶ 37,506 at 182,199 n.7 ("SCA provisions will apply to a government contract even where they were left out of the solicitation or the contract." (quoting *Miller's Moving Co.*, ASBCA No. 43114, 92-1 BCA ¶ 24,707 at 123,325-26)); *see Christian & Assocs. v. United States*, 312 F.2d 418, 427 (Ct. Cl.

---

[12] We use the terms "pay" and "labor rates" to refer to the total compensation earned by service workers.  Where necessary to distinguish the individual components of pay, we use the specific terms "wages," "fringe benefits," "overtime," etc.

[13] Although we make this finding as a matter of law, ITI's factual argument that it considered the SCA inapplicable due to omission of the SCA clause is both unsupported by any affirmative contemporaneous evidence and it is contradicted by the language in ITI's proposal regarding the SCA and WDs, reviewed in detail above.

1963) (mandatory contract clause expressing a significant public procurement policy will be incorporated into the contract by operation of law).  For this reason, the fundamental premise of ITI's claim, that the SCA did not apply to the contract or ITI prior to the SCA clause's incorporation in 2012, is without merit.

Regarding WD35, ITI also argues, as it did to DOL and in its certified claim, that it considered WD35 "ineffective" and "left dangling and without meaning" due to the absence of the SCA clause (app. mot. at 3; app. reply at 3).  This is an ambitious argument given the language to the contrary in the contract,[14] that WD35 was inarguably designated in the contract as "the wage determination," that WD 35 was attached to the solicitation and contract, and that ITI's own proposal said ITI used DOL WDs to set the compensation of its workers.[15]  Further, ITI offers no authority or precedent where a contractor was excused from complying with an applicable WD that was attached to its contract, and the case law holds exactly the opposite – that WDs apply even when they are omitted.  *Miller's Moving Co.*, 92-1 BCA ¶ 24,707 at 123,326 ("[w]e conclude that the DOL wage rate determinations under the Service Contract Act were binding on appellant whether it had actual notification thereof or not."); *BUI Constr. Co. & Bldg. Supply*, ASBCA No. 28707, 84-1 BCA ¶ 17,183 at 85,578 (Wage determinations and labor standards provisions are binding on contractor despite omission from solicitation – no equitable adjustment due under the changes clause); *but see BellSouth Commc'ns Sys., Inc.*, ASBCA No. 45955, 94-3 BCA ¶ 27,231 at 135,699-700 (*Christian* doctrine does not override contracting officer's affirmative conclusion that Davis-Bacon standards did not apply; equitable adjustment was due for retroactive application of Davis-Bacon wages).  Here, despite its other pre-award errors, DMA attached WD35 to the solicitation and contract as required, and WD35 was the current and most geographically appropriate WD at the time – even if ITI unilaterally chose to ignore it.

Regarding ITI's argument that DMA did not consider the SCA applicable, we find that, regardless of individual DMA employees' subjective intent, inattention to FAR requirements, and actions or inaction, the contract itself, including the attachment

---

[14] "The following documents, exhibits or other attachments [including WD35] . . . form a part of this document" (R4, tab 5 at 40, tab 11 at 29) and "[p]roposed labor rates should be "loaded" rates . . . as required by the Department of Labor . . . ." (R4, tab 5 at 48, tab 11 at 35).

[15] It is also contrary to the cannon of contract interpretation which provides that we should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," if possible, leaving no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,922 (citations omitted).

of WD35, indicate that the SCA and the DOL labor rates set by WD35 were applicable (R4, tab 7 at 2, tab 11 at 2-25, 29, 35, 59-68).

In sum, ITI's arguments about the absence of the SCA clause notwithstanding, the SCA applied to ITI's contract and it required ITI to heed WD35's minimum pay requirements when setting its contract labor rates and when paying its workers for work performed in the first year of the contract and within the geographic scope of WD35.

## II.    ITI's Claim Does Not Fit The Criteria For A FAR 22.1015 Equitable Adjustment

FAR 22.1015 is a remedial and fact-specific regulation that was promulgated in 1989.  *See* FAR, Application of Labor Laws to Government Acquisitions, 54 Fed. Reg. 19812-01,19,816 (May 8, 1989) (codified at 48 CFR Subpart 22.10).  By its clear terms, and as it has been applied by the Boards over the years, FAR 22.1015 steps in when an agency omission or incorrect use of WDs causes a contractor to set its labor rates below what is required by the applicable WDs.  *See, e.g., Sotera Def. Sols., Inc., v. Dep't of Agric.*, CBCA Nos. 6029, 6030, 19-1 BCA ¶ 37,421 at 181,881.  FAR 22.1015 is consistent with case precedent that has provided relief to contractors whose labor costs rose as a result of government errors or omissions regarding labor standards.  *See Kleenco, Inc., d/b/a Superior Linen-Laundry*, ASBCA No. 44348, 93-2 BCA ¶ 25,619 at 127,522-23; *Sterling Services, Inc.*, ASBCA No. 40475, 91-2 BCA ¶ 23,714 at 118,699-700.  Under FAR 22.1015, when WD errors or omissions occur, *and* a contractor's labor rates do not meet or exceed applicable WDs, *and* the errors or omissions are corrected by DOL at the expense of the contractor, the contracting agency is required to provide an equitable adjustment for the increased labor costs to comply with the applicable WDs.

Here, in contrast, ITI has not shown, nor attempted to show to DOL, DMA, or the Board, that its claim meets the fundamental FAR 22.1015 criteria – that any omission of WDs (or ITI's own opinion that WD35 was "ineffective") induced ITI to set its contract rates below applicable WD rates.  And, as we have found above, very few of ITI's contract rates were, in fact, below the applicable WDs (including WD35) anyway.

To the contrary, we have already found that DMA's inclusion of WD35 was not an error or omission, so any DOL assessment based on WD35 is categorically excluded from entitlement under FAR 22.1015.  Further, our attempt to compare ITI's contract rates with WD35 (made difficult by ITI's failure to seek DOL conformance

17

for its 51 contract labor categories[16]) suggests that ITI's contract labor rates were, in fact, compliant with WD35, whether ITI specifically used WD35 in its contract labor rate setting decisions or not.  Similarly, DCAA's supplemental audit shows that ITI's contract labor rates were above the applicable WD rates both in the aggregate, and in many individual instances (R4, tab 545 at 6, 12-45).  Because FAR 22.1015 only applies when a contractor incurs unanticipated labor costs, and ITI's contract labor rates were by-definition anticipated, there can be no equitable adjustment in those instances where ITI's contract rates met or exceeded WD35 or any of the subsequent WDs.[17]

Next, the remedies in FAR 22.1015 are limited to costs caused by a government wage determination mistake and this FAR provision is not a free pass for contractors to obtain compensation for unrelated labor problems of their own making.  There is no entitlement under FAR 22.1015, or any other law or legal precedent of which we are aware, that DOL assessments against the contractor for misclassification, nonpayment of overtime, and insufficient fringes can or should be reimbursed by the government.  So here, even where DMA failed to incorporate applicable WDs during performance, and where DOL used those omitted/applicable WDs as part of the back pay calculations for the unrelated labor violations, there is no entitlement to an equitable adjustment under FAR 22.1015 for the unrelated labor violations.  This applies to the majority of DOL's assessment against ITI which was based primarily upon ITI's misclassifications, not ITI's contract labor rates (R4, tab 550 at 8-10, 24).

ITI also asserts entitlement under the equitable adjustment language in Modification Nos. 11-16, and under the Changes clause, as a contractual route to entitlement seemingly separate from FAR 22.1015 (R4, tab 543 at 6; app. mot. at 13-15; app. reply at 3-6).  But both of those claimed bases of entitlement are redundant to ITI's FAR 22.1015 claim, and we fail to see – nor has ITI demonstrated – how those clauses could entitle ITI to a recovery where FAR 22.1015 does not.  As ITI recognized in its certified claim, the equitable adjustment language in Modification Nos. 11-16 "mirrored" the language in FAR 22.1015 (R4, tab 543 at 3).  So, for the same reasons discussed above, ITI's entitlement is limited to the relatively few WD underpayments where ITI's contract rates were below the later-added WDs.  ITI's other costs – imposed upon ITI by DOL for ITI's misclassifications and other labor violations, did not arise solely from application of the additional WDs so they are not

---

[16] *See Sterling Services, Inc.*, 91-2 BCA ¶ 23,714 at 118,698 ("[T]he burden of inaccurate or missing wage rate classifications is placed on [the contractor], not the Government, by the contract, the Service Contract Act and the case law.").

[17] This is true even if we were to accept ITI's argument that WD35 was ineffective without the SCA clause and/or that ITI justifiably ignored WD35 when setting its contract labor rates.

18

recoverable under the equitable adjustment language in the modifications, or under the changes clause.

III. **ITI Is Entitled To An Equitable Adjustment For A Portion Of DOL's WD Underpayment Assessment**

It is only where ITI's contract labor rates were actually below the later WDs that applied to work outside the scope of WD35 and which were not included in the contract, and DOL assessed backpay that included the difference between the contract rates and the applicable WD rates, <u>and</u> DOL's assessment was not based upon any of the unrelated labor violations, that ITI qualifies for an equitable adjustment under FAR 22.1015.  And, at the risk of repetition, ITI's own decision to pay its workers below its own contract labor rates cannot be attributed to DMA's omission of WDs and cannot qualify for equitable adjustment entitlement under FAR 22.1015.  Thus, ITI's WD underpayment entitlement is limited to the difference between ITI's contract labor rates and the back pay actually paid by DOL that was based solely on WD underpayment – not the difference between any lower actual pay and the correct WD rates, as ITI's claim seeks.  While we do not consider specific quantum calculations here, DCAA's supplemental audit (R4, tab 545) appears aimed at comparing ITI's contract labor rates to the applicable WD rates, which may help the parties negotiate quantum.

IV. **ITI is not entitled to an interlocutory judgment of $568,754 Because The Board Reviews ITI's Claim** *De Novo*

ITI seeks $568,754 based on the contracting officer's final decision which determined that amount to be the appropriate equitable adjustment (app. mot. at 21; app. reply at 8-9).  But an appellant is not free to pick and choose elements of a COFD to appeal while leaving the remainder binding on the government.  Instead, we review contractors' claims and contracting officers' final decisions *de novo* giving no deference to the COFD findings.  41 U.S.C. § 7104(b)(4); *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (*en banc*); *Naseem Al-Oula Co.*, ASBCA No. 61321 *et al.*, 20-1 BCA ¶ 37,490 at 182,149 (citing *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA Nos. 59738, 59909, 19-1 BCA ¶ 37,301 at 181,453 and 41 U.S.C. § 7103(e)).  So, as DMA correctly points out, the Board's *de novo* review of ITI's certified claim means that the Board, not the Contracting Officer, decides ITI's entitlement and quantum.

DOCUMENT FOR PUBLIC RELEASE.  The decision issued on the date below is subject to an ASBCA Protective Order.  This version has been approved for public release.
## CONCLUSION

We have considered all arguments advanced by the parties, whether discussed here or not.  Based upon our decisions above, we resolve entitlement, with respect to Appeal No. 61686, as follows:

1. ITI is not entitled to an equitable adjustment for the portions of the DOL settlement that were based upon labor violations unrelated to DMA's omission of applicable WDs, *to wit*, ITI is not entitled to recover its DOL-induced back pay for ITI's misclassification, nonpayment of overtime, and insufficient fringes violations.

2. ITI in not entitled to an equitable adjustment for any portion of the DOL settlement where WD35 was used to calculate the assessment.

3. ITI is not entitled to an equitable adjustment where its contract labor rates were not exceeded by applicable WDs.

4. ITI is entitled to an equitable adjustment for the portion of the DOL induced back pay based solely upon ITI's WD underpayment, measured by the difference between ITI's contract labor rates and any higher WD rates.

Appeal No. 62185 is denied.

It appears that there is sufficient information in the record that, combined with our entitlement decision, should enable the parties to calculate and agree upon the quantum element of this dispute.  Therefore, the parties will submit a joint status report within 60 days indicating their proposal, or in the event of disagreement separate proposals, for remand to negotiate quantum or for further proceedings.

Dated:  July 26, 2023

BRIAN S. SMITH
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61686, 62185, Appeals of Innovative Technologies, Inc., rendered in conformance with the Board's Charter.

Dated: July 28, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

21